Argued and submitted July 3, 2008, affirmed January 28, petition for review denied June 4, 2009 (346 Or 258)

TRI-COUNTY CENTER TRUST,
successor in interest to
Gordon R. Martin, Sr.,
*Plaintiff-Respondent,*

*v.*

Stephen B. MARTIN,
personal representative of the
Estate of Gordon S. Martin, Jr., Deceased,
and Tigard Triangle Development, LLC,
*Defendants-Appellants.*

Washington County Circuit Court
C000763CV; A125278

201 P3d 293

Robert J. Custis argued the cause and filed the briefs for appellants.

Gregory J. Miner argued the cause for respondent. With him on the briefs were Travis W. Hall and Bateman Seidel Miner Blomgren Chellis & Gram, P.C.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Wollheim, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendants appeal from a judgment directing the partition by division of real property that the original parties held as tenants in common.[1] The issue presented on appeal is whether real property that was owned by one of the original cotenants and his wife and that adjoined the partitioned property could be considered in assessing the potential use and value of the partitioned property in order to divide the property between the cotenants equally. Defendants contend that the adjoining property should have been considered in making the division by assigning a plottage value to the portion of the partitioned property that was distributed to the party who owned the adjoining property with his wife, which would reflect the fact that that party could combine his portion and the adjoining property to allow a more intensive and, hence, valuable use of the combined property. We review *de novo*. ORS 19.415(3); *Maupin v. Opie*, 156 Or App 52, 55, 964 P2d 1117, *rev den*, 328 Or 194 (1998). For the reasons explained below, we reject the use of plottage value in this case and affirm.

The original parties to this action were a father, Gordon R. Martin, Senior (Senior), and his son, Gordon S. Martin, Junior (Junior), who owned land in Tigard as tenants in common. The property consisted of four parcels of development property totaling approximately 16 acres.[2] It was largely landlocked from major streets, except for portions lining SW 72nd Avenue to the east and a small portion that had access to Hermoso Way, a smaller street to the south. The property also adjoined approximately 10 acres of property to the southeast, part of which had access to SW 72nd Avenue and all of which Senior and his wife owned. Those characteristics of the property are depicted in the following map.

---

[1] Due to events that occurred after the trial court directed the partition of the property, *see* 225 Or App at 425-26, both the original plaintiff and defendant have been substituted by the current plaintiff and defendants, respectively, after the original parties submitted their briefs on appeal.

[2] The exact acreage was found to be 15.67 acres. For simplicity, however, we use the term "16-acre plot" when referring generally to the property subject to the partition proceeding.

The entire 26-acre plot was subject to a vested development plan approved by the City of Tigard. However, Senior and Junior could not agree on how to develop the 16-acre plot, making the sale or lease of either the 26-acre plot or the 16-acre plot impossible. In light of that stalemate, Senior brought an action in equity in 2000, seeking, among other things, to partition the land by public sale. Junior, in response, sought partition in kind.

The court appointed three referees—Liebow, Wapnick, and Wood—to make recommendations regarding partition of the property. The referees first concluded that the parties' development of the full 26 acres under the approved development plan would achieve the highest value to the parties. Barring that, the referees determined that a public sale of the entire 26 acres, rather than a partition in kind, would result in the highest value to the parties.

Absent the parties' ability to agree on the development or sale of the entire 26 acres, the referees focused on the 16 acres subject to the partition proceeding. They concluded that a public sale of the 16-acre plot would realize the highest value to the parties, at an average of approximately $8 per

square foot. In contrast, the referees concluded that, if the court were to order partition in kind and each party developed his portion independently, the average value of the property would drop to $6.40 per square foot due to "access challenges" and other considerations. The referees also noted that, in the event of an in-kind partition, an equal partition should be based on value, not pro rata on an acreage or square-foot basis, because the portion fronting SW 72nd Avenue had visibility and access from that street, whereas the interior portion, which adjoined the 10-acre plot owned by Senior and had limited access only to Hermoso Way, was "access and site challenged." They calculated the value of the property fronting SW 72nd Avenue at $16 per square foot and the interior portion at approximately $4 per square foot. Accordingly, the referees recommended that, if the court were inclined to order an equal partition in kind between the parties, it award Junior 3.134 acres of the higher-value land fronting SW 72nd Avenue (East partition) and Senior the remaining 12.536 acres making up the lower-value interior portion (West partition).

After reviewing the report and testimony by two of the referees at a hearing, Judge Bonebrake concluded that the value that each party would realize from a partition in kind would "not be materially less than that party's share of money that could be obtained for the whole by public sale" for several reasons. He first noted that the referees' conclusions about the development of the full 26 acres were "not particularly relevant" to the proceeding, given that the parties were unable to agree on development, and, hence, that he was "dealing only with the 16-acre plot." He then opined that the access challenges to the West partition—a factor in the referees' conclusion that the land's average value declined from $8 per square foot at public sale to $6.40 per square foot if partitioned in kind—would be mitigated by granting a nonexclusive easement across the East partition, and by incorporating the fact that Senior owned the adjoining 10 acres "over which access exists." Finally, he observed that, even if the 16-acre plot was worth $8 per square foot in an arm's-length transaction, the land was unlikely to fetch that price at public sale. Accordingly, Judge Bonebrake directed

the referees to partition the 16-acre plot, awarding Junior the East partition, "subject to a non-exclusive easement of appropriate width across that property" to benefit the West partition, which was to be awarded to Senior. The judge further directed:

> "In dividing the property so that each party is awarded property of equal value, the referees, in addition to the foregoing, will take into account the fact that [Senior] and his wife own the adjoining ten acres over which access to [the West partition from SW 72nd Avenue] may occur."

That opinion issued in December 2001. In February 2004, the referees subsequently submitted a revised report to Judge McElligott.[3] In that report, the referees observed that the plot measured approximately 15.67 acres and recommended that the court award Junior 4.67 acres of the East partition (up from the 3.134 acres recommended in 2001) and Senior 11.00 acres (down from the 12.536 acres originally recommended). The referees outlined their methodology for reaching those results. First, the referees determined the value of the full plot, in light of Judge Bonebrake's instructions to assume no access problems for the West partition, to average $12.50 per square foot, for a total value of $8,532,315. Accordingly, the referees began with the assumption that an equal partition required each party to receive land valued at $4,266,157.50.

From that initial value, the referees adjusted the value attributable to each party based on (1) a $100,000 mortgage that encumbered a tax lot entirely within the West partition and (2) a $300,000 payment that Senior had made to the City of Tigard in 2003 to pay the interest due on a Local Improvement District (LID) assessment on a tax lot that made up the majority of the 16-acre plot.[4] The referees recommended increasing Senior's share by $200,000 (the sum of

---

[3] In the interim, Judge Bonebrake had retired.

[4] The parties had other claims for contribution and reimbursement that the referees recommended that the court resolve in other proceedings independent of the partition proceeding. The referees determined that the claims for the LID interest payment and the mortgage were, however, of a different nature and should be valued as part of the partition.

one-half of the mortgage and one-half of the LID interest payment) and reducing Junior's share by the same. The referees maintained their opinion that the East partition had higher value than the West partition, and assigned the East partition a value of $20 per square foot based on "current pad transactions in the region." Hence, they recommended that the court award Junior 4.67 acres[5] valued at $20 per square foot, for a full value of $4,066,157.50. The referees did not assign an independent value to the land in the West partition; rather, based on the value attributable to the land in the East partition and the average land value of $12.50 per square foot for all of the land in the 16-acre plot, they determined that an award of the remaining 11 acres was worth $4,466,157.50. The referees also considered the court-ordered easement in the East partition and determined that it had no material value to either party. Because Senior could create access through the adjoining 10-acre plot, he did not need the easement through the East partition. Further, the referees agreed that, even if there were such an easement, it would not affect the value of the East partition.

In April 2004, Judge McElligott held a hearing to review the referees' report. Two of the referees, Liebow and Wood, testified at the hearing. They each stated that they had understood Judge Bonebrake's instruction to consider Senior's adjoining property "over which access may occur" to mean that the referees were to assume, for valuation purposes, that the proposed partition awarded to Senior would have adequate access to SW 72nd Avenue through his adjoining 10-acre plot. Furthermore, Wood explained that they decided to incorporate an adjustment for the LID interest payment because it was a mandatory payment that, normally, partners in the property would share equally. In this case, Wood explained, Senior had paid the entire amount of interest due—in other words, both his and Junior's share—to

---

[5] We note that the report appears to have a minor inconsistency in its recommendations. On page one, the referees summarize their ultimate conclusion that the court should award Junior 4.65 acres to Senior's 11.02 acres. The remainder of the report describes the referees' methodology and the recommended adjustments, at the end of which the referees recommend that the court award Junior 4.67 acres to Senior's 11.00 acres. We assume that the latter set of numbers, which accords with the referees' calculations, is the correct set.

avoid foreclosure on the property, and, accordingly, the referees adjusted the amount of land awarded to each party to account for that debt.

Junior presented the report and expert testimony of Jensen, a real property appraiser, whom Junior had retained to review the referees' opinion and to appraise the proposed partitions independently. Jensen agreed with the referees that the East partition had a higher value than the West partition; however, he initially valued the partitions at $15 and $10 per square foot, respectively, based on the value of roughly comparable land in the Portland metropolitan area that, like the East partition, required some improvements before the property could be developed. Jensen then adjusted the value of the West partition based in large part on "plottage value," a figure that takes into account Senior's 10-acre plot adjacent to the West partition and the possibility that Senior could unify both properties to attract a large retailer and, accordingly, command a higher value. Jensen calculated the plottage to add $5 per square foot to the West partition's value (for a total value of $15 per square foot). Rather than reflect that value by adjusting the division of the land, which Jensen believed would destroy Senior's ability to develop the West partition for a large retail use, Jensen recommended that the court award an equalizing payment of $910,642.50 from Senior to Junior.

In findings of fact, Judge McElligott largely adopted the referees' recommendations. He found that the entire parcel had a value of $8,532,315 (based on the referees' conclusion that the average value was $12.50 per square foot), and that, before any adjustments, each party was to receive a partition valued at $4,266,157.50. He also found that the East partition was worth $20 per square foot, resulting in an award to Junior, before adjustments, of 213,307.87 square feet (or 4.8969 acres) as his equal value share. He then allocated the remainder of the property to Senior (469,277.33 square feet or 10.7731 acres) and found, by dividing the full value Senior was to receive ($4,266,157.50) by 469,277.33 square feet, that that property was valued at $9.09 per square foot. The court also adopted the referees' recommendation that Junior should forfeit land worth $200,000 to reflect his share of the mortgage and the LID interest

expense. However, the court set aside the referees' determination that those adjustments be calculated at $20 per square foot; rather, the court determined that the adjustments should be calculated at $14.545, which was the average between $20 per square foot, the value of the East partition, and $9.09 per square foot, the value of the West partition. The court allowed Junior to pay Senior the LID interest owed before the judgment to avoid any adjustment for the debt. In the event that Junior did not elect that option, which he ultimately did not, the court calculated Junior's net allocated share of property to be 4.5835 acres, with Senior receiving the remaining 11.0865. The court also rejected Junior's request to adjust the partition based on various topographical improvements that the East partition required before it could be developed.

That judgment was entered in June 2004; the court subsequently issued a supplemental judgment, corrected general judgment, corrected findings of fact, and corrected supplemental judgment by August 2004.[6] Junior appealed the June 2004 judgment as well as the subsequent judgments but did not file a supersedeas undertaking. After Junior filed his appeal, several events occurred. In June 2005, Senior sold the West partition and the adjacent 10-acre plot to Pacific Realty Associates and transferred the proceeds to the current plaintiff, Tri-County Center Trust. Following that sale, Senior moved to dismiss the appeal on the ground that that sale of the West partition rendered the appeal moot because there was no practical relief that we could award on appeal. Junior opposed Senior's motion to dismiss on the ground that we would have authority to award compensation in lieu of adjusting the size of partitions awarded. The motions panel of this court deferred to the merits panel a ruling on the motion because it appeared to be inextricably bound up with the merits of the appeal.

In December 2006, Junior transferred the East partition to one of the current defendants, Tigard Triangle Development, LLC. In January 2007, Junior died. Senior

---

[6] In the subsequent judgments, the court made minor adjustments to the award based on land surveys and determined other matters that are not relevant to the issues presented on appeal.

subsequently renewed his motion to dismiss the appeal for mootness because the judgment partitioning the property was entirely in-kind, both parties had transferred the property, and, accordingly, we could not alter the partition. Alternatively, Senior moved for the court (1) to substitute Tri-County Center Trust in his place as plaintiff, and (2) to substitute Tigard Triangle Development in place of Junior as defendant. Junior's estate, meanwhile, moved to substitute Stephen B. Martin, personal representative of Junior's estate, as defendant. Because it was unclear whether Junior had assigned his interest in the litigation to Tigard Triangle Development or whether, upon Junior's death, Junior's interest inured to his estate and whether those events rendered the appeal moot, the motions panel allowed all of the motions to substitute parties and deferred to the merits panel a decision on Senior's motion to dismiss for mootness.

On appeal, defendants make two assignments of error. First, defendants argue that the trial court erred in relying on the referees' report rather than Jensen's appraisal to make its findings of fact. Second, they argue that the trial court erred by accepting the referees' recommendation to split the LID interest expense between the parties equally. Defendants assert that the LID interest expense should have been divided on a square-foot basis, the manner in which the city assesses that expense. In response, plaintiff reasserts its argument that defendants' appeal is moot based on the subsequent transfers of the partitions and defendants' failure to file a supersedeas bond. Alternatively, it responds that the trial court did not err in relying on the referees' report, and that the court properly split the LID expense as past debt jointly owed by the parties as tenants in common.

■■ We begin by addressing plaintiff's motion to dismiss the appeal as moot. A case is moot when "a court's decision no longer will have a practical effect on or concerning the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993). Our case law does not directly address what a "practical effect" entails in situations in which parties subsequently transfer land subject to an in-kind partition proceeding, nor whether we may make a monetary adjustment on appeal to correct an entirely in-kind partition. However, on *de novo* review, the record supports a partition based either

on the referees' report, which recommended a land partition based on relative values of land and adjusted for debts attributable to that land, or the Jensen appraisal, which advocated the *same* allocation of land but with a $910,642.50 equalizing payment to correct alleged errors in the referees' recommendations. Thus framed, the relief at issue on appeal is solely monetary, and we cannot identify a principle that would foreclose our ability to give defendants the monetary award that they seek. Hence, we conclude that the appeal is not moot.

■     Thus, the central issue here is whether the trial court properly relied on the referees' report rather than the Jensen appraisal in awarding the parties an equitable partition in kind. The primary difference between the referees' conclusions and Jensen's conclusions was the additional $5 per square foot that Jensen attributed to the West partition due to "plottage value." Accordingly, for defendants to prevail, we would necessarily need to agree, first, that plottage value is an appropriate consideration in evaluating the fair market value of real property for purposes of making an in-kind partition, and, second, that Jensen's proposed $910,642.50 equalizing judgment reflects such plottage value.

We need not reach the second question, however, because we do not believe that plottage value based on adjoining property is a proper consideration in determining the fair market value of land subject to an equitable partition in kind. As an initial matter, we do not understand Judge Bonebrake's order to require the referees to incorporate plottage value in their valuations. The text of Judge Bonebrake's instructions, where he directed the referees to "take into account the fact that [Senior] and his wife own the adjoining ten acres over which access to that parcel being awarded to [Senior] may occur," simply directs the referees to consider the land adjoining the West partition inasmuch as it could eliminate the West partition's access problems, not inasmuch as it would enhance the value of land in the West partition.

Indeed, our reading of the instruction in the context of Judge Bonebrake's entire order supports that conclusion. He referred in the instruction to two aspects of the referees'

first report: (1) the referees' recommendations that the highest and best use of the land was to develop the entire 26-acre plot according to the development plan in place, and (2) the referees' conclusion that, in the event of a partition in kind, the West partition had a much lower fair market value due to its "access challenges" to 72nd Avenue. Judge Bonebrake first explained that the loss of the development plan for the 26-acre plot was not relevant to the proceeding, observing that it was clear that the parties were never going to agree on developing the 26 acres as a whole, and, as such, they were "dealing with only the 16-acre plot," which cuts against any suggestion that the judge wanted plottage value factored into the valuation. He further noted that any access challenges to the West partition could be mitigated by granting a nonexclusive easement across the East partition, "and also by reason of the fact that [Senior] owns, either individually or with his wife, the remaining ten acres, over which access exists," which further bolsters the conclusion that consideration of the adjoining 10-acre plot is only to mitigate access problems with the West partition.

Even if we were to assume that Judge Bonebrake had instructed the referees to factor plottage value into their valuation, we conclude that plottage value is an improper consideration in the context of determining value for a partition in kind. Plottage, or "assemblage," value is a doctrine that some jurisdictions[7] use in valuing land in eminent domain proceedings. *See Plottage or Assemblage*, 26 Am Jur 2d Eminent Domain 688 § 303 (2004); *see, e.g.*, *City of Lafayette v. Richard*, 549 So 2d 909, 911 (La Ct App 3d Cir 1989); *Clarmar Realty v. Redevelopment Authority*, 383 NW 2d 890, 895 (Wis 1986). We are aware of no case in Oregon or in other jurisdictions holding that, in the context of a partition proceeding, a court may consider ownership of adjacent property as a factor in determining the fair market value of land subject to an in-kind partition.[8] Nor are we persuaded

---

[7] Oregon does not appear to consider plottage to determine the fair market value of land in its condemnation proceedings, although our courts have applied a similar concept called "severance damages" in the case of a partial taking of property. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 574, 825 P2d 641 (1992) ("In the case of a partial taking of property, the measure of damages is the fair market value of the property acquired plus any depreciation in the fair market value of the remaining property caused by the taking.").

[8] At least one other jurisdiction has discussed plottage value in the context of a partition proceeding. *See Hegewald v. Neal*, 20 Wash App 517, 582 P2d 529,

by defendants' argument that plottage is an appropriate valuation factor here. The fact that one party owns (or partly owns) property adjoining the parcel subject to the partition proceeding is a mere fortuity. If courts were to incorporate plottage to set a higher value of land awarded to a cotenant—and either award that cotenant less land or impose an equalizing payment to the other cotenant—the end result would have the other cotenant benefit from his or her former cotenant's ownership of adjacent land. We can identify no legal principle that supports that result.

Accordingly, we reject defendants' argument that plottage value of the type advanced here is a valid factor in valuing the property in this partition proceeding. Based on our limited posture, as explained above, we consequently reject defendants' argument that the trial court should have relied on the Jensen appraisal and imposed an equalizing judgment, and conclude that the trial court properly relied on the referees' report.

■■ Likewise, we reject defendants' second assignment of error, in which they argue that the trial court should have apportioned the LID interest payment on a square-foot basis, rather than a 50-50 basis between the former tenants in common. A cotenant, or tenant in common, is obliged to contribute his or her pro rata share toward expenses such as property taxes, encumbrances on the land, and necessary insurance. *See Palmer v. Protrka*, 257 Or 23, 31, 476 P2d 185 (1970). Although it is true that the City of Tigard assesses the LID on a square-foot basis, at the time that the LID interest payment became due, Junior and Senior were tenants in common and thus, were jointly responsible for that debt. Senior paid the entirety of that $300,000 debt; accordingly, Junior, as a cotenant, owed Senior $150,000 as his share. Given that, defendants' argument that we should transform that past obligation for half of the LID debt into a lower number based on the square footage of real property awarded to defendants is unfounded, and we reject it.

---

*rev den*, 91 Wash 2d 1007 (1978). In that case, the court heard evidence of the plottage value of real property, if it were to be used as a unified whole, as part of its evaluation of whether a partition in kind of particular real property would greatly prejudice the owners, *not* as a factor in its calculation of the property's fair market value. *Id*. at 526, 582 P2d at 534.

In summary, we conclude that the referees' report comported with Judge Bonebrake's instructions and proposed an equitable partition in kind of the 16 acres at issue in this case. The trial court's judgment adopting the referees' valuation of the property and assessing the LID debt on a 50-50 basis between the parties also was equitable. Hence, we affirm.

Affirmed.